# Third District Court of Appeal

## State of Florida

Opinion filed January 9, 2019.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1500
Lower Tribunal No. 14-27980
_____

**Maurice A. Talley,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Richard L. Hersch, Judge.

Law Offices of Aubrey Webb, P.A., and Aubrey Webb, for appellant.

Ashley Brooke Moody, Attorney General, and Natalia Costea, Assistant Attorney General, for appellee.

Before LOGUE, and LINDSEY, JJ., and SUAREZ, Senior Judge.

LINDSEY, J.

Maurice Talley appeals his conviction and sentence for the first-degree murder of Roger Glenn. Talley contends reversal is required because (i) the trial court erred in denying his motion for mistrial following the emotional outburst of the victim's family in front of the jury; (ii) the trial court abused its discretion in denying his proposed special jury instructions; (iii) the improper comments made by the prosecutor during closing arguments, collectively, constitute fundamental error; and (iv) the trial court erred in denying his motions for judgment of acquittal given the insufficient evidence and circumstantial nature of the case. For the reasons set forth below, we disagree and affirm.

**I. BACKGROUND**

Police responded to an apartment complex located in Miami Gardens where Roger "Loso" Glenn was killed after being shot in the head. Upon arriving at the scene, police found Glenn's girlfriend, Stacy Tyler, crying hysterically over the victim's body in the hallway outside of the door of her apartment. Stacy's sister, Tracy Tyler, was also there and identified herself and Stacy to Officer Bryan Blanco, who was one of the first officers on the scene. According to Officer Blanco, Tracy told him that immediately preceding the shooting, an individual she knew as "Maurice" was outside Stacy's apartment yelling for the victim to come outside. Tracy further told Officer Blanco that, shortly after the victim exited the apartment, she heard an argument followed by a loud bang, which she described as a gunshot.

2

According to Officer Blanco, Tracy described an individual running from the scene who was of a medium build with a short haircut, in his 20s, and wearing a gray hoodie jacket with dark jeans. This description also matched the description Tracy gave to the 911 operator. Further, Stacy provided Officer Blanco with the same description.[1]

Tracy testified about the interaction she had with Talley upon arriving at the apartment complex on the day of the shooting. Specifically, Tracy testified that Talley asked where Stacy and the victim were because the victim "wanted his money back" and that "today is the deadline." Tracy explained that Stacy was dating the victim who was known to her as "Loso." Tracy further testified that later the same day the victim and Talley got into a heated argument in the courtyard over the money, with a physical altercation avoided only after people nearby held the two men back. After that heated argument, Tracy, Stacy, and the victim returned to Stacy's apartment where they all consumed alcohol, joined by Helen Tyler, Tracy and Stacy's aunt.

---

[1] During its direct examination of Officer Blanco, the State asked, in reference to the identity of the individual in the gray hoodie and dark jeans, whether Tracy indicated "that she knew this Maurice or was this someone unknown." In response, Officer Blanco testified that, "[s]he stated it was a person known to her." In addition, Officer Blanco was permitted to testify, over objection, that Stacy told him "a person she knows by the name of Reece [also referred to throughout the testimony as Maurice] shot her boyfriend." Further, according to Officer Blanco, Stacy "did not state that she witnessed the person shoot him but only that she saw the person running from that location."

3

Tracy further testified that after drinking for approximately ten minutes, she left the apartment and went upstairs to another apartment to visit her mother's friend. Tracy stated that when she returned to her sister's apartment "a couple of seconds" later, Talley was knocking on the door and yelling for the victim to come outside. Tracy testified that no one else was in the hallway, and that she went inside the apartment and told the victim that Talley was at the door. As she had previously explained to Officer Blanco, Tracy testified that she heard a gunshot shortly after the victim walked out of the apartment.

When Tracy opened the apartment door, she saw the victim on the ground and immediately called 911, telling the operator that "Maurice" had shot the victim. A portion of the 911 recording was played for the jury during which Tracy can be heard frantically telling the operator that "some boy name Maurice" shot the victim after "[h]e knocked on my sister's door and say that he wanted to talk to 'em." Tracy further told the operator that "[h]e had on a sweat, a sweatshirt that was gray, and some black jeans." In addition, Tracy identified Talley in a photo line-up.

Further, during the State's direct examination, Tracy testified that she suffers from paranoid schizophrenia and depression. She also testified that, while she did sometimes take the prescription drug, Valium, she had not taken any on the day of the murder. During cross-examination, Tracy testified that she sometimes hears

4

voices, thinks people are following her, and has seen spirits since she was a little girl.

Stacy testified that she was the victim's girlfriend and that her nickname for him was "Loso." She also witnessed the argument between Talley and the victim over money on the day of the shooting. Stacy testified that she had consumed alcohol with the victim, Tracy, and her aunt Helen, but was not so impaired that she was unable to perceive what was going on. Stacy further testified that when her sister told the victim that Talley was at the door, the victim exited the apartment, alone and unarmed, and closed the door behind him. She stated that the victim did not own a gun. A few seconds after the victim walked outside, Stacy testified that she heard a single gunshot.

Once outside the apartment, Stacy saw the victim on the ground and, except for a single male running from the scene, the hallway was empty. Stacy testified that she could not discern the fleeing man's identity from behind, but that he was wearing a gray hoodie sweatshirt and "had a fro."[2] Later at the police station, Stacy identified Talley from a photo line-up as the person involved with the victim in the argument earlier in the day in the courtyard. In addition, she testified that she had previously seen Tally because he has two children with her neighbor, Lenora, and

_____

[2] At trial, Detective Pacheco testified that a mugshot taken following Talley's arrest approximately two weeks after the shooting depicted Talley with a "kind of bushy" hair style.

5

visits often. Similar to her sister, Stacy testified that she sometimes sees dead people and that they sometimes touch her.

Helen testified that she too saw Talley in the courtyard earlier on the day of the murder. She further testified that Tracy came into the apartment and said that someone wanted to talk to the victim and that the victim exited the apartment. Within seconds, a gunshot rang out.

Crime scene technicians found a single spent casing underneath the victim's body, but no fingerprints or DNA was collected. Additionally, a single projectile was recovered from the victim's body following the medical examiner's autopsy. A firearm and tool mark examiner with the Miami-Dade Police Department testified that the spent projectile and recovered casing were most likely fired from the same 9mm firearm; however, no weapon was found at the scene or subsequently recovered.

At trial, during the State's opening statement, proceedings were briefly interrupted when several members of the victim's family became emotional during the State's remarks on the medical examiner's expected testimony. The family members abruptly left the courtroom crying, and defense counsel moved for a mistrial based on the disruption in front of the jury. At a sidebar discussion, the trial court denied Talley's motion because "there was nothing directed to any particular juror or at the jury," there was no verbal communication by the spectators, and that

the upset family members "acted in an appropriate manner by exiting from the courtroom." At defense counsel's request, the trial court gave a curative instruction for the jury to disregard any disruptions that may occur and that the jury's verdict "must be based on the evidence."

After the State rested, Talley moved for judgment of acquittal and argued the State was unable to exclude every reasonable hypothesis of innocence as required in a purely circumstantial evidence case. The trial court denied Talley's first and second motions for judgment of acquittal. The trial court also denied defense counsel's request for a special jury instruction specifically addressing how the jurors should weigh testimony of witnesses under the influence of alcohol or drugs. The jury found Talley guilty of first-degree murder with the discharge of a firearm. This timely appeal followed.

On appeal, Talley seeks reversal on the following grounds: (i) the trial court erred in denying his motion for mistrial following the emotional outburst of the victim's family in front of the jury; (ii) the trial court abused its discretion in denying his proposed special jury instructions; (iii) the improper comments made by the prosecutor during closing arguments, collectively, constitute fundamental error; and (iv) the trial court erred in denying his motions for judgment of acquittal given the

7

insufficient evidence and circumstantial nature of the case. We address each of these arguments below.[3]

## II. STANDARD OF REVIEW

A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. Knight v. State, 76 So. 3d 879, 885 (Fla. 2011). We similarly review the denial of a criminal defendant's request for a special jury instruction under an abuse of discretion standard. Billie v. State, 963 So. 2d 837, 839 (Fla. 3d DCA 2007) (citing Stephens v. State, 787 So. 2d 747, 755 (Fla. 2001)).

A motion for judgment of acquittal is reviewed under a *de novo* standard, and a conviction will not be reversed where it is supported by competent substantial evidence. Giralt v. State, 935 So. 2d 599, 601 (Fla. 3d DCA 2006) (citing Boyd v. State, 910 So. 2d 167, 180 (Fla. 2005)). However, a special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. State v. Law, 559 So. 2d 187 (Fla. 1989). The State must only introduce competent evidence "inconsistent with the defendant's theory of events, and is not required to conclusively rebut every possible variation of events which can be inferred from the evidence." Giralt, 935 So. 2d at 601.

---

[3] Talley also claims the trial court erred in failing to strike the testimony of both Tracy and Stacy Tyler. We affirm the trial court on this issue without discussion.

If the State demonstrates an inconsistency with the defendant's theory, trial courts "should deny the motion for judgment of acquittal and allow the jury to resolve the inconsistency." Id. at 602. Upon reviewing the evidence in a light most favorable to the State, if a rational juror could find the existence of the elements of the offense beyond a reasonable doubt, there is sufficient evidence to sustain the conviction. See Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002) (citing Banks v. State, 732 So. 2d 1065 (Fla. 1999)).

## III. ANALYSIS

### A. Motion for Mistrial

Several of the victim's family members became emotional during opening statements and exited the courtroom visibly and audibly crying. According to Talley, this outburst prevented him from a fair and impartial jury in that it constituted improper contact with the jury. As a result, Talley claims he was prejudiced and is entitled to a new trial. We disagree. The granting of a motion for mistrial is not based on whether an error is merely prejudicial but rather whether "an error is so prejudicial as to vitiate the entire trial." Wellons v. State, 87 So. 3d 1223, 1225 (Fla. 3d DCA 2012) (quoting Salazar v. State, 991 So. 2d 364, 372 (Fla. 2008)). "In order for the prosecutor's comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so

9

inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." Id. at 1224 (quoting Spencer v. State, 645 So. 2d 377, 383 (Fla. 1994)).

When considering defense counsel's motion, the trial court stated on the record that "two or three" family members left the courtroom when they became emotional during a portion of the prosecutor's opening remarks. The trial court emphasized that nothing was directed to any particular juror or the jury and that the upset family members "acted in an appropriate manner by exiting the courtroom." Moreover, a curative instruction was given to the jury at defense counsel's request. As such, we conclude that the family members' non-verbal, emotional outburst was in no way "so prejudicial so as to vitiate the entire trial." See Wellons, 87 So. 3d at 1225 (citation omitted). Accordingly, we cannot find that the trial court abused its discretion in denying the motion for mistrial.[4] See Joseph v. State, 704 So. 2d 1149

---

[4] In addition, we decline Talley's invitation on appeal to adopt a new standard requiring trial courts to poll the jury any time there is an emotional outburst or disruption by a spectator during trial proceedings. First, no request was made to the trial court to poll the jurors. Second, we believe the decision of whether to poll jurors is better left to the discretion of trial judges who are in the best position to assess the intensity of the outburst and its potential effect on jurors. See Thomas v. State, 748 So. 2d 970, 980 (Fla. 1999) ("In reviewing motions for mistrial dealing with emotional outbursts from witnesses, appellate courts should defer to trial judges' judgments and rulings when they cannot glean from the record how intense a witness's outburst was.") (citing Arbelaez v. State, 626 So.2d 169, 176 (Fla.1993); Torres–Arboledo v. State, 524 So.2d 403, 409 (Fla.1988); Justus v. State, 438 So.2d 358, 366 (Fla.1983)).

10

(Fla. 3d DCA 1998) ("[T]he strong curative instruction promptly given by the trial court alleviated any possible prejudice, thus the court correctly denied the mistrial motion." (citing Kivett v. State, 629 So. 2d 249 (Fla. 3d DCA 1993))).

## B. Special Jury Instructions

Next, Talley argues the trial court abused its discretion in denying his request for a special jury instruction regarding the effect of drugs or alcohol on a witness's ability to perceive and recall.[5] According to Talley, he first proposed the following modification to the standard instructions:

> The testimony of someone who is shown to have used addictive drugs or alcohol during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. The jury must determine whether the testimony of the drug or alcohol abuse has been affected by the drug or alcohol use of the need for drugs or alcohol. You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

Alternatively, Talley proposed:

> In judging the credibility of a witness you may also take into account the effect, if any, of drug usage upon the witnesses' ability to accurately perceive, remember, and recall.

---

[5] During trial, Tracy specifically denied taking Valium or any other drugs on the day of the murder. While Stacy admitted to having consumed alcohol that day, she testified that it did not affect her ability to see, hear, or perceive the events on the date in question.

11

The trial court denied the request as to both proposed instructions, ultimately concluding that the standard instructions adequately covered the juror's responsibility to weigh the evidence and evaluate the reliability of a witness's testimony. The standard instructions given here instructed the jury to consider, in part, the following when weighing a witness's testimony:

1. Did the witness seem to have an opportunity to see and know the things about which the witness testified?

2. Did the witness seem to have an accurate memory?

3. Was the witness honest and straightforward in answering the attorneys' questions
. . . .

5. Does the witness's testimony agree with the other testimony and other evidence in the case?
. . . .

8. Did the witness at some other time make a statement that is inconsistent with the testimony [he] [she] gave in court?

See Fla. Std. Jury Instr. (Crim.) 3.9. The jury was further instructed to consider, among other factors, the following in deciding how much weight to give the elicited eyewitness testimony: (i) "[t]he capacity and opportunity of the eyewitness to observe the Defendant based upon the length of time for observation and the conditions at the time of the observation"; (ii) "[w]hether the identification was the product of the eyewitness's own recollection or was the result of influence or suggestiveness"; (iii) [a]ny inconsistent identification made by the eyewitness"; and

12

(iv) "[t]he totality of circumstances surrounding the eyewitness's identification." See Fla. Std. Jury Instr. (Crim.) 3.9.

In Stephens v. State, the Florida Supreme Court explained that "[i]n order to be entitled to a special jury instruction, [the defendant] must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing." 787 So. 2d at 756 (footnotes omitted). Thus, here, Talley has the burden of demonstrating that the trial court abused its discretion in giving only the standard instructions.

Standard jury instructions for criminal trials are presumed correct and are generally preferred over special instructions. Stephens, 787 So. 2d at 755. While a defendant maintains the right to have the jury instructed on any valid theory of defense, failure to grant a modification to standard instructions is not an error where the instructions given adequately cover applicable legal standards and the defendant's theories of the case. See Chiarenza v. State, 217 So. 3d 128 (Fla. 3d DCA 2017); see also Stephens, 787 So. 2d at 755 (citation omitted).

Here, Talley argues the trial court abused its discretion in denying his proposed special jury instructions because the State's case rested on the testimony of Tracy and Stacy, both of whom admitted to consuming alcohol on the day of the shooting, and both of whom testified they could sometimes hear or see dead people.

13

We reject this argument. Although the proposed instructions covered Talley's theory that Tracy and Stacy were mistaken as to their version of events because of alcohol use or questionable mental health, Talley failed to meet his burden to prove the standard instructions given did not adequately cover his theory of the case. See Alvarez v. State, 890 So. 2d 389, 397 (Fla. 1st DCA 2004) ("Where the Florida Standard Jury Instruction adequately apprises the jury as to the law and evidence, it is proper to give the standard instruction rather than a requested special instruction.") (citing Carpenter v. State, 785 So. 2d 1182, 1200 (Fla. 2001)).

There is no question that the jury understood the reliability of the sisters' testimony to be central in determining whether the State proved its case beyond a reasonable doubt. The reliability and credibility of Tracy and Stacy's recollection of the events surrounding the victim's murder was presented to the jury in great detail by both sides throughout the trial. However, the standard jury instructions, together with the juror's common sense, provided sufficient guidance in assessing the reliability of the witnesses' perception and the potential effect of contemporaneous alcohol use on the witness' perception and ability to recall.

As such, we conclude that the jury received adequate instruction on their duty to weigh facts and circumstances that could have any bearing on the witnesses' reliability and credibility, including the consumption of alcohol or history of mental health issues. See Sutton v. State, 909 So. 2d 292, 293 (Fla. 3d DCA 2004)

14

(concluding that the reliability of an eyewitness who consumed drugs and alcohol on the weekend of the murder "was within the common understanding and common sense of lay jurors and the standard jury instruction on weighing the evidence was adequate"). Therefore, we cannot find that the trial court abused its discretion in denying the request for special jury instruction(s).

## C. Alleged Improper Comments During Closing Argument

Talley asserts that the prosecutor made several improper comments during closing arguments that collectively rise to the level of fundamental error. The only comment that defense counsel objected to was made in the following context:

> [STATE]: I submit to you ask yourself this question. How much courage it took for those women to come in here and tell 14 people sitting in a box not to mention everybody else in this courtroom watching them, the Judge, the prosecution, the Defense, the defendant sitting here, how much courage did it takes [sic] from [sic] them to come from that neighborhood to sit on that stand and tell you what they saw, ask yourselves. They didn't want to do it, we talked about it. We had to put them on monitors, we had to get the Court involved to basically get them in here and cooperate *because they come from a neighborhood you don't snitch. You don't snitch* and you don't talk[.]

(Emphasis added).

This comment, while certainly improper, when considered individually or collectively with any of the other purportedly improper comments, does not warrant reversal. The prosecutor's "snitch" comment was isolated, it was not repeated before or after the objection, and the remark was not made a theme or feature of the

15

State's closing. See Lammons v. State, 246 So. 3d 524, 526 (Fla. 3d DCA 2018) (holding that the objected-to improper comment by the prosecutor was harmless error because it was isolated, not repeated after the objection, and was not made a feature of the State's rebuttal close).

Further, the trial court sustained the objection and upon the request of defense counsel, gave the following curative instruction: "I'm going to have to ask the jury to disregard that last statement[—counsel for the State's] inappropriate argument made in this case."[6] Any error was cured by the curative instruction and the instruction sufficiently dispelled any prejudicial effect from the "snitch" remark. See Jennings v. State, 124 So. 3d 257, 266 (Fla. 3d DCA 2013) ("Generally speaking, the use of a curative instruction to dispel the prejudicial effect of an objectionable comment is sufficient." (quoting Rivera v. State, 745 So. 2d 343, 345 (Fla. 4th DCA 1999))). In addition, after the defense had rested and prior to closing argument, the trial court instructed the jury that what the attorneys say in closing is not evidence.

Next, we address Talley's argument that the prosecutor made improper and inflammatory comments, to which he did not object, that warrant reversal. "In order to preserve an allegedly improper prosecutorial comment for review, a defendant must object to the comment and move for a mistrial." State v. Revenel, 184 So. 3d

---

[6] The defense did not move for a mistrial.

16

629, 631 (Fla. 3d DCA 2016) (quoting <u>Gutierrez v. State</u>, 731 So. 2d 94, 95 (Fla. 4th DCA 1999)). Florida courts recognize that an "exception to the contemporaneous objection rule is where the unobjected-to comments rise to the level of fundamental error . . . ." <u>Card v. State</u>, 803 So. 2d 613, 622 (Fla. 2001) (citing <u>McDonald v. State</u>, 743 So. 2d 501, 505 (Fla. 1999)); <u>see also</u> <u>Bell v. State</u>, 108 So. 3d 639, 650 (Fla. 2013) (holding that unpreserved claims regarding improper prosecutorial comments during closing argument are reviewed for fundamental error).

"Fundamental error is that which 'reaches down into the validity of the trial such that a guilty verdict . . . could not have been obtained without the assistance of the alleged error.'" <u>Bell</u>, 108 So. 3d at 650 (quoting <u>Wade v. State</u>, 41 So. 3d 857, 868 (Fla. 2010)). The Florida Supreme Court has explained the contemporaneous objection rule and its fundamental error exception as follows:

> [F]ailing to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review. The sole exception to the general rule is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error."

<u>Simpson v. State</u>, 3 So. 3d 1135, 1146 (Fla. 2009) (quoting <u>Brooks v. State</u>, 762 So. 2d 879, 899 (Fla. 2000)).

17

"We conduct a two-part inquiry to determine if closing comments comprise fundamental error. First, we determine whether the comments were impermissible." Robinson v. State, 211 So. 3d 59, 60 (Fla. 4th DCA 2017). Next, we must resolve whether the improper comment constitutes fundamental error by determining if it affected the validity of Talley's trial such that, but for the comment, the jury could not have reached the verdict it did. See Farina v. State, 937 So. 2d 612, 629 (Fla. 2006) (citing Miller v. State, 782 So. 2d 426, 432 (Fla. 2d DCA 2001)).

The first unobjected-to comment is as follows:

> [STATE]: Obviously [Stacy, Tracy, and Helen Tyler] have stuff they are dealing with. Okay, they have stuff they are dealing with. *For you to discount their testimony, you would have to discount Stacy, Tracy and Helen. You would have to find all three are liars* and then he walks.[7] You walk him. You acquit him he walks out the door. *For you to acquit him you have to discount all three of those ladies and ask yourselves this.* You heard the 911 call which is mere moments after the shooting happened. Do you think these women were sophisticated enough to take that moment in time and say oh, my God Loso is dead, you know what I don't know who did it let's pin this on Maurice Talley. Let's pin it on Maurice. Come on, we have a couple of seconds here come on ladies let's get this together I saw this and you saw that, okay, we're going to take Maurice out on this one.

(Emphasis added).

---

[7] In its Answer Brief, the State concedes that the prosecutor's statement, "[y]ou would have to find all three are liars," was improper pursuant to this Court's decision in Atkins v. State, 878 So. 2d 460 (Fla. 3d DCA 2004). However, in Atkins, the defense preserved the issue and moved for a mistrial, which was denied.

18

The second comment Talley contends was improper for the prosecutor to remark is as follows:

> Your job is simply to look at the evidence, consider his actions on that day and determine which crime the State has proven . . . . And, of course *if you find that he did not commit a crime, then you will acquit him of everything and he walks out the door with you.* If you think his actions on December 5th of the year 2014 don't constitute a crime of any variety . . . if you think of what he did on that day does not constitute a crime, then you acquit him.

(Emphasis added).

The final alleged improper comment occurred in the State's rebuttal as follows:

> There is no evidence that was presented to you that we were in custody of Maurice's Talley's phone. There is no evidence that there were any cell phone records. We would have brought it to you.
>
> Members of the jury, if you disbelieve the testimony of the Tylers, if you think that they are all crazy that they've made it up that Maurice Talley was there, *then walk him. Let him walk out that door acquit him.* I submit to you that is not reasonable.

(Emphasis added).

First, Talley contends the prosecutor's "walk out the door" references impermissibly appealed to the jury's community conscience and cumulatively constitute fundamental error. We disagree. We recognize that Florida courts have consistently "condemned impassioned arguments which appeal to the jury's community sensibilities or civil conscience." <u>Fleurimond v. State</u>, 10 So. 3d 1140,

1149 (Fla. 3d DCA 2009) (citing Smith v. State, 818 So. 2d 707, 710 (Fla. 5th DCA 2002); Otero v. State, 754 So. 2d 765, 769 (Fla. 3d DCA 2000); Birren v. State, 750 So. 2d 168, 169 (Fla. 3d DCA 2000)); see also Charriez v. State, 96 So. 3d 1127, 1128 (Fla. 5th DCA 2012); Norman v. Gloria Farms, Inc., 668 So. 2d 1016, 1021 (Fla. 4th DCA 1996). However, when considered in the context of the entire closing argument, the prosecutor's "walk out the door" comments were not an improper appeal to the jury's community sensibilities or conscience. Further, contrary to Talley's assertion, the "walk out the door" comments did not suggest that the jury pick a side, condone the victim's murder if returning a not guilty verdict, or convict Talley for the good of the community.

The cases relied on by Talley are readily distinguishable, and they contain comments far more egregious and numerous than the closing remarks in the instant case. In Crew v. State, 146 So. 3d 101 (Fla. 5th DCA 2014), one of two cases cited by Tally involving reversal on the basis of fundamental error, the prosecutor's improper comments included: "We're talking about justice for DJ and we're talking *about letting that man* walk . . . . Hold him accountable for what he's done. Don't let him get out of here and make this cheap. Don't make it cheap. Don't make it a misdemeanor." Id. at 106. The prosecutor further stated, among numerous other improper comments, that, "*Jerry Crew doesn't have a moralistic thing about him. Not one. Jerry Crew is nothing more than a hopeless old crack addict . . . .*" Id. at

20

104. The prosecutor continued with *"This is a moralistic person? This is a person who has a limitation on what's wrong and what's right? No, not at all."* Id. at 105. In addition, the prosecutor stated, *"My God, imagine how high he's going to be. His little crackhead eyes are going to glow."* Id. And, the prosecutor continued on from there with *"It's like Christmas come early for a crackhead"* and "[the defendant] *gets to walk out of here without facing any of the facts of what he's done . . . ."* Id. at 105-06.

Moreover, in addition to the foregoing vitriolic, demeaning, and inflammatory comments set forth above, which are some, but not all of those considered by the court in Crew to be improper, the prosecutor commented on defense counsel's out-of-court questioning and cross-examination of a State witness who had suffered a stroke. Id. Finally, after all of the foregoing, the prosecutor began referring to defense counsel solely by his first name and finished with a discussion of the victim and his family, stating, *"Don't spit in his family's face."* Id.

In Pacifico v. State, 642 So. 2d 1178 (Fla. 1st DCA 1994), the second of Talley's cases involving fundamental error, a new trial was warranted in light of the trial court's denial of two motions for mistrial and numerous improper comments by the prosecutor, to which some were objected and some not. Specifically, the defense challenged five specific areas of prosecutorial misconduct, contending the cumulative effect of which constituted fundamental error: (1) the prosecutor's "free

man" comments; (2) the prosecutor's use of pejorative terms to characterize the defendant; (3) the prosecutor's statement that "[t]his defendant is a criminal, and he needs to be convicted" to suggest that he has the propensity to commit a crime; (4) the prosecutor's reference to the defendant as "a liar" and asking the jury to send a message about lying in the courtroom; and (5) the prosecutor's reference to matters not in evidence and to her personal beliefs about the evidence. Id. at 1182-84.

Clearly, the improper comments in Crew and Pacifico crossed the line of acceptable advocacy. In the instant matter, however, the State's "walk out the door" comments, which would not have been made in a perfect trial, did not reach the line crossed in Crew and Pacifico and do not rise to the level of fundamental error.

Lastly, Talley asserts that the prosecutor impermissibly shifted the burden of proof by telling the jury, "[f]or you to discount their testimony, you would have to discount Stacy, Tracy and Helen. You would have to find all three are liars and then he walks." At the outset, we conclude that this burden-shifting comment was indeed improper. However, as set forth above, this comment did not draw an objection from the defense. We recognize that this particular comment improperly suggested to the jury that acquittal was proper only if they found the State's witnesses to be dishonest. However, we do not find that this comment rises to the level of fundamental error, when considered individually or cumulatively with the other alleged improper comments. While the burden-shifting comment was improper, it

22

was isolated, and the jury was repeatedly told by the prosecutor, defense counsel, and trial judge that the State had the burden of proving Talley's guilt beyond and to the exclusion of all reasonable doubt. Indeed, after making the isolated burden-shifting remark, the prosecutor provided the jury with an accurate statement of the law.[8] See Poole v. State, 151 So. 3d 402, 415 (Fla. 2014) (explaining that once a comment is found to be improper, "factors to be weighed in determining whether an improper comment rises to the level of fundamental error include whether the statement was repeated and whether the jury was provided with an accurate statement of the law after the improper comment was made" (citing Poole v. State, 997 So. 2d 382, 395 (Fla. 2008))).

After the State raised an objection during defense counsel's closing, the trial court read to the jury the reasonable doubt instruction, which includes an explanation of the State's burden of proof. Furthermore, because the jury instructions contained lesser-included offenses and the discharge of a firearm was alleged, the trial court charged the jury four different times that the State had to prove beyond a reasonable doubt that Talley committed first-degree murder or any lesser-included offense.

---

[8] Following the burden-shifting comment, the prosecutor told the jury "[w]e have to prove beyond a reasonable doubt, beyond and to the exclusion of all reasonable doubt that this defendant is guilty of the crime of murder." Later, the prosecutor stated "[r]emember you [sic] not judging this man, you are judging the evidence of his actions on that particular day."

23

This was in addition to the standard instruction on reasonable doubt and burden of proof.

Accordingly, we do not believe that the isolated error here, notwithstanding its impropriety, reached the level of fundamental error such that a verdict of guilty could not have been obtained without the assistance of the improper comments. See Sampson v. State, 213 So. 3d 1090, 1092 (Fla. 3d DCA 2017) ("We affirm, concluding that the prosecutor's arguments, while improper, did not constitute fundamental error."); Augustine v. State, 143 So. 3d 940, 940-41 (Fla. 4th DCA 2014) (finding no fundamental error despite explaining that "[a]ny one of the improper arguments here may have warranted reversal if preserved"); Rodriguez v. State, 27 So. 3d 753, 754 (3d DCA 2010) (finding that the prosecutor's misstatement as to the State's burden of proof was not fundamental error where the error was not intentional, the misstatement could have been corrected with a curative instruction had defense counsel objected, and the jury was repeatedly instructed on the correct burden of proof); Montanye v. State, 976 So. 2d 29, 31 (Fla. 5th DCA 2008) ("Upon careful review of the instant record we conclude that the prosecutor's improper statements do not rise to the level of fundamental error . . . ."); State v. Fountain, 930 So. 2d 865, 867 (Fla. 1st DCA 2006) ("Although the prosecutor's statements were improper, the unpreserved error was not fundamental.").

Finally, the cases Talley cites to support his claim that the improper burden-shifting comments warrant a new trial are inapposite, as those cases either do not involve the application of the fundamental error standard or address significantly more errors than at issue here. See, e.g., Maharaj v. State, 78 So. 3d 63 (Fla. 4th DCA 2012) (finding that the State's improper burden-shifting comments during closing argument did not constitute fundamental error but reversing on other grounds); Atkins v. State, 878 So. 2d 460 (Fla. 3d DCA 2004) (finding that the trial court abused its discretion in denying defendant's motion for mistrial where the sole defense was misidentification and prosecutor stated: "[w]e're not saying that [what the victim] said is not true, he must be mistaken and he said he's not a liar. He would have to be a liar, he would absolutely have to be a liar."); Pacifico, 642 So. 2d 1178 (reversing based on extensive prosecutorial misconduct throughout trial that included comments appealing to the jury's community conscience, derogatory references to the defendant, impermissible prior bad act impeachment, improper comments on matters not in evidence, and erroneous expressions of personal belief). In contrast, we are considering whether isolated, unpreserved comments, individually or collectively with the single preserved "snitch" remark, rises to the level of fundamental error. They do not.

**D. Judgment of Acquittal**

The last argument Talley raises on appeal is that the trial court erred in denying his motion for judgment of acquittal given what he characterizes as the insufficient and circumstantial nature of the evidence. When considering a motion for judgment of acquittal, all evidence is viewed in the light most favorable to the State. Irizarry v. State, 905 So. 2d 160, 165 (Fla. 3d DCA 2005). In wholly circumstantial evidence cases, such as the instant case, the standard applicable is as follows:

> [A] motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the [S]tate fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt. However, [t]he [S]tate is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence fails to exclude all reasonable hypotheses of innocence . . . and where there is substantial, competent evidence to support the jury verdict, [the Court] will not reverse.

Davis v. State, 207 So. 3d 177, 195 (Fla. 2016) (alterations in original) (internal citations and quotations omitted).

Talley's sole theory of defense was that Tracy and Stacy were mistaken and lacked credibility because they admitted to consuming alcohol on the day of the

26

shooting and their testimony raised questions as to their mental health.[9]  As such, Talley asserts the evidence does not exclude his hypothesis that the State's witnesses placing Talley at the scene were mistaken or hallucinating.  We disagree as sufficient evidence exists in the record to contradict Talley's hypothesis.  "It is the function of the jury, not of the court, to weigh the evidence and to assess the credibility of the witnesses."  Del Rio v. State, 478 So. 2d 79, 80 (Fla. 3d DCA 1985) (citing Rodriguez v. State, 436 So. 2d 219, 220 (Fla. 3d DCA 1983)).  Thus, in viewing all evidence in the light most favorable to the State, we conclude that the State satisfied its burden of introducing evidence inconsistent with Talley's version of events to support the denial of his motion for judgment of acquittal.

## E.  CONCLUSION

Based on the foregoing, we find no abuse of discretion in the trial court's denial of Talley's requested special jury instructions or motion for mistrial.  We further find that the improper comments made by the prosecutor during closing argument do not individually or cumulatively warrant a new trial.  Finally, we affirm the trial court's denial of Talley's motions for judgment of acquittal because the State introduced competent evidence inconsistent with Talley's hypothesis of

---

[9] In denying Talley's motions for judgment of acquittal, the trial court noted that there was never any challenge to the competency of Tracy or Stacy.

27

innocence sufficient to allow the jury to determine whether the evidence failed to exclude all reasonable hypotheses of innocence.

Affirmed.